UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Johnny K., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 19 CV 50082 |
| v. ) | |
| ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Johnny K. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying his disability insurance benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded.

**I. Background**[1]

Plaintiff submitted his application for disability insurance benefits on November 18, 2015. Plaintiff alleged that he suffered from degenerative disc disease with an alleged onset date of November 1, 2014. Plaintiff's medical records reveal an extensive and complicated medical history, including four spinal surgeries over a span of 15 years with another surgery contemplated at the time of the hearing. R. 44, 50.

Plaintiff's claim was initially denied on March 28, 2016, and upon reconsideration on September 12, 2016. Plaintiff filed a written request for a hearing on October 1, 2016, and the

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.

1

Administrative Law Judge ("ALJ") held a video hearing on February 27, 2018. Plaintiff appeared in Rockford, Illinois, represented by an attorney, and testified at a hearing before the ALJ. The ALJ also heard testimony from Stephanie R. Archer, a vocational expert.

At the time of the hearing, Plaintiff was 45 years old. Plaintiff testified that he lived with his wife and three daughters, who were between 12 and 15 years old. R. 39. Plaintiff hurt his back in a work accident on November 1, 2014, which is the alleged onset date. R. 41-42. He worked as a truck driver for the same company since August 1993 which, at the alleged onset date, was about 21 years. R. 40. He averaged 12-hour workdays. R. 41. According to Plaintiff, the physical activity his work required included sitting, walking, carrying equipment, and lifting objects that weigh up to 75-100 pounds. R. 41. When asked what he believed was keeping him from doing any kind of work since November 2014, Plaintiff testified that it was due to his doctors not releasing him, his pain, the medications he takes, and his severe depression. R. 45.

Following his back injury Plaintiff attempted to alleviate his pain with aquatic and physical therapy, epidural steroid injections, anti-inflammatories, oral steroids, interscalene blocks, trigger point injections, and prescription pain medications. R. 281, 325, 338, 387, 525-90. However, after exhausting these options, Plaintiff and his doctors chose to move forward with surgery. R. 710. On June 15, 2016, Plaintiff underwent L4-L5 and L5-S1 laminectomies, L5-S1 posterior spinal fusion with local autograft bone graft, allograft bone graft, iliac crest autograft and instrumentation, and interbody fusion with cages. R. 762, 833. In the months following this surgery, Plaintiff and his doctors noted significant improvement in some respects, but Plaintiff continued to experience pain, numbness, and tingling. R. 1078. Thus, in August 2017, Plaintiff underwent another surgery. Plaintiff was scheduled for a thoracic lumbar surgery which included T11-12 and T12-L1 anterior decompression and fusions with cages, followed by a posterior

thoracic decompression and fusion T5-L1 with local autograft, allograft, iliac crest autograft, and instrumentation. R. 997, 1000, 1078. However, due to "intraoperative liability," the surgery was not fully completed. R. 49, 50, 1156. Accordingly, Plaintiff and his doctors noted more improvement following this surgery, but Plaintiff still had significant pain. R. 1182. At the time of the hearing in February 2018, Plaintiff and his doctors were planning to finish the procedure, which meant yet another surgery: a posterior thoracic decompression and fusion T5-L1 with local autograft, allograft, iliac crest autograft, and instrumentation. R. 1188.

At the hearing Plaintiff was asked about the effect his back surgeries had on his symptoms. He stated:

> The first surgery that they did really helped with my left leg. It got to the point where when I would get up in the morning, I couldn't put any weight on my left leg. That surgery really helped that issue. The last surgery that I had in 2017 where they came in from the side and took out a rib, before that surgery I couldn't lay on my back without feeling like my quadriceps had a blow torch on them. That has gotten significantly better.

R. 46-47. However, even with these surgeries he still suffers constant pain including in his mid-back, and ribs. He also suffers leg weakness. R.46- 47. In addition, Plaintiff testified that he experiences tension headaches a couple of times a week, which last approximately 8-9 hours. R. 52-53. At the time of the hearing, Plaintiff testified that the recommended next treatment involved fusing or putting rods in his spine, but that he had an appointment scheduled to get another opinion before moving forward. R. 50.

Plaintiff regularly takes the following medications: Norco, Cyclobenzaprine, and Gabapentin, as well as Lexapro for depression, Fioricet for tension headaches, and another medication for his frequent bladder issues. R. 47, 52-53. When asked about any side effects, Plaintiff stated that Lexapro makes him feel exhausted, and he attributes much of his weight gain

3

following his most recent surgery to this medication. R. 47-48. He also stated that the side effect he experiences from Norco is constipation. R. 47.

When asked if he has used any devices to help him walk since November 2014, Plaintiff testified that he has used a cane, walker, back brace, and stimulator. R. 48-49. He typically used a cane and walker immediately after surgery for several weeks. R. 48. He was directed to use the cane by his home healthcare, and he still uses the cane if he is in a situation where he does not know how far he will have to walk. R. 48. With respect to the brace, which he had on at the hearing, Plaintiff testified that it was prescribed by Dr. McNally and he had been wearing it consistently since his last surgery in August 2017. R. 48. He stated that, since they were not able to finish the surgery, the brace "helps to make sure nothing can move." R. 49. Regarding the stimulator, Plaintiff testified that he used one after his 2016 surgery for about 6-7 months and he has been using it again after this last surgery. R. 49. Plaintiff also stated that Dr. McNally issued him a handicap parking placard. R. 49.

Plaintiff testified that he can stand in one spot for about 5 minutes before his legs start to twitch and tremble. R. 53. He stated he can walk for about 10 minutes and sit comfortably for about 10-15 minutes before needing to get up and move around. R. 53. He testified that the most comfortable position for him to be in is laying down on his side. R. 54. When asked about the most he could lift, Plaintiff responded: "I don't lift anything bigger than a gallon of milk really." R. 54.

Plaintiff testified that he experienced depression episodes daily. R. 51-52. He stated that these episodes include crying and feeling worthless and useless because he used to work 70 hours a week and now feels like he "can't do nothing." R. 52. When asked why he hadn't pursued seeing a psychiatrist, psychologist, or case worker therapist despite it being recommended, he testified that he was afraid that they could not help. R. 51.

4

Regarding daily activities, Plaintiff testified that his wife and children do the chores, and he does not do dishes, laundry, housekeeping, grocery shopping, or yard work. R. 54-55. When asked if he cooks while his wife is at work and his kids are in school, he responded: "Not really. I may make a sandwich, drink protein drinks, stuff like that." R. 54. He bathes every 3-4 days to minimize the number of times he risks slipping and falling in the shower. R. 56. He testified that he dresses himself daily, but if his back or legs are hurting badly, his wife will pull up his socks and he sometimes will wear the same socks for 2-3 days. R. 56. Plaintiff's typical day sometimes involves taking his kids to school in the morning and then going to his parents' home if he does not feel like sitting at home alone. R. 57. On the days he does not want to be around anyone, he stated that he will just go back home and watch television or lay down. R. 57. Plaintiff testified that he does not sleep well at night due to the pain, which causes him to constantly adjust to try to get comfortable, as well as wake up and get out of bed in the middle of the night. R. 58-59.

When asked about his driving habits, Plaintiff stated he drives an average of 3-4 days per week. R. 55. He testified that he sometimes drives his daughters to school, which is a less than 10-minute drive, and the only other place he goes is to his parents, which is also about 10 minutes from his home. R. 55-56. When asked if he drove himself to the hearing, Plaintiff testified that he had his father drop him off for the hearing because he didn't want to risk having to walk very far. R. 55.

Plaintiff's treating physician, Dr. Thomas McNally, filled out two physical medical source statements, one in June 2016 and one in February 2018. R. 987-990, 1178-1181. In the June 2016 statement, Dr. McNally noted that Plaintiff had spinal stenosis of the lumbar region with radiculopathy. He opined that as a result Plaintiff could not walk a city block without rest or severe pain; could stand for 10 minutes at a time before needing to sit down or walk around; could not sit

5

for any period of time; could never lift or carry anything more than 10 pounds; could never twist, stoop, crouch/squat, climb stairs, or climb ladders; would be off-task more than 25% of a workday; was likely to be absent more than 4 days a month; and was medically unable to work. R. 987-990. In the February 2018 statement, Dr. McNally opined that Plaintiff could not walk more than 5-10 minutes without rest or severe pain; could stand for 10 minutes at a time before needing to sit down or walk around; could not sit in an 8-hour workday; could never lift or carry anything more than 10 pounds;[2] could never twist, stoop, crouch/squat, climb stairs, or climb ladders; would be off-task more than 25% of a workday; was likely to be absent more than 4 days a month; and was medically unable to work. R. 1178-1181. The ALJ assigned little weight to Dr. McNally's opinion. R. 27.

On September 9, 2016, agency physician Dr. Sai Nimmagadda completed a physical RFC assessment based on the medical record up to that point. R. 90-93. Dr. Nimmagadda opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk about 6 hours in a normal 8-hour workday; and sit for about 6 hours in a normal 8-hour workday. R. 90-91. He further opined that Plaintiff could climb ramps/stairs, balance, stoop, kneel, crouch, and crawl frequently, and climb ladders/ropes/scaffolds occasionally. R. 91. The ALJ assigned some weight to Dr. Nimmagadda's opinion. R. 26.

On March 19, 2018, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. The ALJ found that Plaintiff had the following severe impairments: spine radiculopathy with lower left extremities, depression disorder, and obesity. The ALJ determined that Plaintiff's

---

[2] The ALJ, Plaintiff, and Commissioner all interpret Dr. McNally's 2018 physical medical source statement as reporting that Plaintiff could not lift or carry anything less than 10 pounds. In reviewing the medical source statement, it appears that Dr. McNally did not check any of the boxes with respect to that weight limitation. Therefore, it is unclear to the Court whether Dr. McNally believed that Plaintiff could lift anything under 10 pounds. This should be clarified on remand.

impairments did not meet or medically equal the severity of a listed impairment. The ALJ concluded that Plaintiff had the RFC to perform sedentary work, except he could lift and carry 10 pounds occasionally and less than 10 pounds frequently; could sit for 6 hours, stand for 2 hours, walk for 2 hours, push and pull as much as he can carry; could climb ramps and stairs occasionally; could never climb ladders, ropes, and scaffolds; could occasionally stoop, kneel, crouch, and crawl; is limited to simple work-related decisions; would need to have the ability to alternate to standing for 2 minutes after every 15 minutes of sitting; and would need to be able to alternate to sitting for 5 minutes after every 15 minutes of standing or walking. The ALJ found that Plaintiff was unable to perform his past relevant work as a water truck driver or semi-truck driver but, based on his age and high school education, he could perform other jobs such as an address clerk, order clerk, or telephone quotation clerk.

Plaintiff filed a request for review of the hearing decision with the Appeals Council, who denied review on February 7, 2019. On April 8, 2019, Plaintiff filed a complaint with the Court requesting judicial review of the Commissioner's adverse decision.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Id. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399–401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

### III. Discussion

Plaintiff raises 4 main arguments: (1) the ALJ's opinion analysis is flawed because he did not adhere to the treating physician rule in his decision to assign "little weight" to Dr. McNally's opinion and assigned greater weight to the outdated opinions by the Agency doctors; (2) the ALJ failed to consider all of the evidence in the record when making his subjective symptoms analysis; (3) the ALJ erred by failing to properly assess Plaintiff's moderate limitations in concentration, persistence, and pace; and (4) the Commissioner failed to present substantial evidence that jobs exist at Step 5 in significant numbers.

**Treating Physician Rule[3]**

---

[3] The Social Security Administration recently modified the treating-physician rule to eliminate the "controlling weight" instruction. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply.") (emphasis added) *with* 20 C.F.R. § 404.1520c ("For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply."). Plaintiff's application in this case was filed in 2014. Accordingly, the ALJ was required to apply the treating physician rule when deciding Plaintiff's application.

8

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is "not inconsistent with the other substantial evidence in the case." 20 CFR 404.1527(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). A treating physician has "greater familiarity with the claimant's condition and circumstances," and therefore an ALJ may only discount a treating physician's opinions based on good reasons "supported by substantial evidence in the record." *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Here, the ALJ found that Dr. McNally's opinions were not entitled to controlling weight. Rather, the ALJ assigned "little weight" to Dr. McNally's opinion because it was

> inconsistent and not supported by the overall medical record showing improvements and the claimant's own testimony that he could lift a gallon of milk, prepare meals, and drive (Hearing Testimony). Moreover, Dr. McNally's statements indicating the claimant is unable to work is not a medical opinion but rather an administrative finding, dispositive of the case. These issues are reserved to the Commissioner and as such are not entitled to any special significant weight.

R. 27.

*A. Consistency with the medical record*

To support his assignment of little weight to Dr. McNally's opinion, the ALJ first reasoned that the opinion was inconsistent and not supported by the overall medical record showing improvements. However, the ALJ does not state which "improvements" he finds to be inconsistent with Dr. McNally's opinions. As such, this Court is left to speculate as to which claims of medical improvement the ALJ found to be inconsistent with which of Dr. McNally's limitations.

While the ALJ does provide a general overview of Plaintiff's medical records, which does refer to some improvements, the medical records also report continued symptomatology that is consistent with Dr. McNally's limitations. For example, a month before the June 2016 surgery, Plaintiff was experiencing low back pain, left leg and bilateral foot pain, neck pain that radiated

9

down his bilateral arms to his fingers, numbness of his bilateral hands, neck spasms, and midback pain between his shoulder blades. R. 768. Plaintiff's diagnoses at that time included: spinal stenosis of the lumbar region with radiculopathy; cervical spondylosis with radiculopathy; degeneration of intervertebral disc of mid-cervical region; thoracic spinal stenosis; thoracic spondylosis with cord compression; thoracic degenerative disc disease; lumbrosacral spondylosis with radiculopathy; lumbrosacral disc degeneration; cervicalgia; lumbago with sciatica; and radiculopathy of leg. R. 831. In June of 2016, Plaintiff underwent an L4-L5-S1 posterior spinal fusion with local autograft bone graft, allograft bone graft, iliac crest autograft and instrumentation and interbody fusion with cages. R. 762, 833.

The ALJ's medical summary points to statements in the medical records that indicate that Plaintiff experienced some improvements following this 2016 surgery. For example, the ALJ states the cold feelings in Plaintiff's right foot had completely resolved, his left leg felt better, and he had improving back pain. The ALJ also pointed to exam notes that revealed full motion of the lower extremities, negative straight leg raises, no muscle spasms, the ability to heel and toe walk, and full muscle strength in the lower extremities. R. 25

However, the records also reveal that prior to Plaintiff's surgery on August 14, 2017, he had been experiencing pain flare-ups, which he rated as a 6-7 on a pain scale out of 10. R. 1164. While his low back pain had improved, he reported symptoms including persistent midline back pain, burning radiculopathy into the bilateral thighs accompanied by numbness and tingling and muscle spasms. It was due to these ongoing issues that a second surgery was recommended. R. 1004, 1164, 1078. On August 14, 2017, Plaintiff was scheduled to undergo a 10-hour long thoracic lumbar surgery which included T11-12 and T12-L1 anterior decompression and fusions with cages, allograft infuse with the assistance of Dr. Barnett, followed by a posterior thoracic

10

decompression and fusion T5-L1 with local autograft, allograft, iliac crest autograft and instrumentation. R. 997, 1000, 1078, 1090. Consequently, while Plaintiff had some improvement following the first surgery, the ongoing symptomatology was severe enough to warrant this second surgery.

It is important to note that Plaintiff's August 2017 surgery was not fully completed as originally planned due to "intraoperative lability," and, at the time of the hearing, Plaintiff and his doctors were anticipating a future surgery for the remaining procedures. R. 49, 50, 1156. The fact that another surgery was being planned tends to contradict the assumption that Plaintiff's condition had improved overall. In addition, the treatment notes following Plaintiff's August 2017 surgery demonstrate that there were still significant unresolved issues. Based on the evidence detailed below, it is clear that the ALJ cherry picked evidence to support his conclusion that the medical records showed overall improvement that was inconsistent with Dr. McNally's restrictions.

At Plaintiff's post-operative appointment on August 29, 2017, Dr. McNally did note that Plaintiff had experienced "complete relief" from the burning sensation in his thighs, which enabled him to lie on his back "for the first time in years." R. 1156. However, Plaintiff reported pain in the rib and abdomen at a level of 5 out of 10, which jumped to 7-8 out of 10 while walking. He also reported numbness and tingling from his ribs down to his groin on the left. Plaintiff was still moving "slowly and carefully" and required the use of a back brace and a walker. He still required Tramadol and Cyclobenzaprine for pain. R. 1156-57. Dr. McNally recorded that Plaintiff was continuing to experience thoracotomy pain and the planned posterior procedure was on hold while Plaintiff continued to heal. R. 1160.[4]

---

[4] The ALJ also pointed to "unremarkable" post-operative imaging following the August 2017 surgery. However, this is problematic. The only type of imaging that was conducted between the August 2017 surgery and the February 2018 hearing were x-rays of the thoracic spine. R. 1135, 1140, 1145, 1151, 1158, 1184. This is relevant because, throughout Plaintiff's treatment history, x-rays were scarcely cited by Plaintiff's doctors in support of their

At a surgical follow-up appointment on September 8, 2017, Nurse Steffen recorded that Plaintiff was experiencing "significant muscle spasms around waist and lower back region," that were accompanied by a pain level of 8 out of 10. R. 997. He was still taking Norco, Cyclobenzaprine, and Gabapentin. He was being visited by a home health nurse weekly, doing home physical therapy twice a week, and given exercises to do three times a day. R. 997. On September 12, 2017, Dr. McNally noted that Plaintiff was still wearing a back brace throughout the day, and he could walk only for approximately 5 minutes without having to take a break. R. 1149-1150.

In October and November 2017, Dr. McNally noted Plaintiff's gradual improvements with pain and spasms. However, Plaintiff was experiencing nerve pain in the bilateral lower extremities, his pain level was at a 4 out of 10, and he was still taking Norco, Cyclobenzaprine, and Gabapentin. R. 1138, 1143. Plaintiff continued to wear his back brace, and he could walk only up to five to ten minutes before needing to rest. R. 1138, 1143-44. Plaintiff expressed his interest in proceeding with the posterior thoracic decompression and fusion T5-L1 with local autograft, allograft, iliac crest autograft, and instrumentation. R. 1147.

In January and February 2018, Plaintiff complained of mid-back pain, lower back pain, sciatic pain, pain in the thoracic region, pain and weakness in the bilateral legs, burning sensations occasionally throughout the day, increased pain after sitting in one position for too long, and continued pain above the thoracolumbar junction. R. 1133, 1136, 1182-83. Nearly six months after the August 2017 surgery, Plaintiff was still managing his pain with Gabapentin, Valium, and

---

diagnoses or as an explanation for Plaintiff's symptoms. Rather, the medical professionals cited findings from MRI, CT, and EMG/NCS tests. R. 291, 339-40, 719, 735, 738, 740, 742-43, 745-46, 878, 880. By using x-rays as evidence to support his conclusion that Plaintiff's recovery was inconsistent with Dr. McNally's 2018 opinion, the ALJ was making his "own independent medical findings" and impermissibly playing doctor. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The ALJ's observation here is further exacerbated by his decision to not call a medical expert at the hearing.

Cyclobenzaprine, and wore his back brace during the day. R. 1133-34, 1182. He remained able to walk "slowly and carefully" for only up to five to ten minutes. R. 1183. He continued to rate his pain as a 4 out of 10, and he continued to express interest in another surgery. R. 1134, 1137, 1188. Much of this evidence was not discussed by the ALJ and seems to be consistent with at least some of Dr. McNally's restrictions. (For example, Dr. McNally opined that Plaintiff could not walk more than 5-10 minutes before needing to sit down which is directly supported by these medical records. R. 1179.)

In sum, the ALJ's finding that Dr. McNally's opinion is inconsistent with the medical record showing overall improvement is not supported by substantial evidence. The opinion fails to identify which improvements were inconsistent with Dr. McNally's restrictions; fails to address the record evidence following the August 2017 surgery showing that many of Plaintiff's symptoms were not resolved; and fails to address those findings in the medical records that were consistent with Dr. McNally's limitations. Finally, the ALJ's opinion fails to confront the evidence that Plaintiff's ongoing symptoms were severe enough to warrant another serious surgical procedure.

*B. Consistency with Plaintiff's testimony*

The ALJ next supports his conclusion to give little weight to Dr. McNally's opinion by indicating that Plaintiff's "own testimony that he could lift a gallon of milk, prepare meals, and drive" was inconsistent with Dr. McNally's assessed limitations. R. 27. The problem with this analysis is the ALJ mischaracterized and overemphasized Plaintiff's testimony and did not address how the testimony is inconsistent with the limitations Dr. McNally recommended.

At the hearing, when asked about the most he was lifting at the present time, Plaintiff answered that he does not lift anything "bigger than a gallon milk." R. 53-54. When asked if he cooks, Plaintiff replied, "not really" and stated that he "may make a sandwich." R. 54-55. Plaintiff

13

also testified that he only drove 3-4 days per week to two locations that are within a 10-minute drive of his home. R. 55-56. The ALJ did not elaborate on how this testimony contradicted Dr. McNally's assessment.

The ALJ took Plaintiff's testimony about his daily activities to be inconsistent with Dr. McNally's assessment of Plaintiff's capacity to work. In doing so, the ALJ overemphasized Plaintiff's daily activities and likened them to activities in a full-time job, which the Seventh Circuit has cautioned against. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("…we have urged caution in equating [a claimant's daily] activities with the challenges of daily employment in a competitive environment."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize [differences between activities of daily living and activities in a full-time job] is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

In addition, the ALJ does not address how Plaintiff's testimony about the above-listed actions is inconsistent with Dr. McNally's stated restrictions. This is error. *See Clifford v. Apfel*, 227 F.3d 863, 871 ("The ALJ did not provide any explanation for his belief that [Plaintiff's] activities are inconsistent with [the treating physician's] opinion and [the] failure to do so constitutes error."). As a result, the ALJ failed to support his conclusion that Plaintiff's testimony about these minimal activities is inconsistent with Dr. McNally's assessment.

*C. Dr. McNally's statements about ability to work*

Lastly, the ALJ took issue with Dr. McNally's statement that Plaintiff was considered medically unable to work. R. 27. Plaintiff argues that, while the statement is not entitled to any special weight, the ALJ erred in using it as a basis to reject Dr. McNally's opinion. Plaintiff is correct. The Seventh Circuit has written directly on the issue: "[A] medical opinion that a claimant

14

is unable to work is not an improper legal conclusion. . . Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (omitting citations). Therefore, this is an insufficient basis to support the ALJ's conclusion that Dr. McNally's opinion was entitled to little weight.

### *D. Regulatory factors*

The ALJ further erred in his analysis when he failed to utilize the regulatory factors set out in 20 C.F.R. § 404.1527(c). If the ALJ does not give the treating physician opinion controlling weight, the ALJ cannot simply disregard it, but must determine what specific weight it should be given. To accomplish this, the ALJ must look to a list of factors to determine what weight to give an opinion. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The list of factors includes the following: examining relationship, treatment relationship (length and nature of treatment relationship and frequency of examination, along with nature and extent of the treatment relationship), supportability, consistency, specialization, and other factors. 20 CFR § 404.1527(c).

The ALJ assigned "little weight" to Dr. McNally's opinion without analyzing any of the factors set forth above. This alone is a ground for remand. *See, e.g. Kimberly L. W. v. Berryhill*, No. 17 C 50281, 2019 U.S. Dist. LEXIS 13791, at *5-6 (N.D. Ill. Jan. 29, 2019); *Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016); *Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug 4, 2015).

There is no mention of the length of the treatment relationship and the frequency of examination, nor the nature and extent of the treatment relationship. According to the record, Plaintiff began seeing Dr. McNally in the fall of 2015 and has had appointments every month thereafter through the hearing date. R. 415, 987, 1178. Dr. McNally had significant familiarity

with Plaintiff's conditions and history due to the monthly appointments, the testing and imaging he ordered to be performed on Plaintiff, and the fact that he had done two surgeries on Plaintiff and has monitored his recovery and progress up to the hearing date. R. 762, 889, 997, 1060, 1066, 1046, 1053, 1138, 1149, 1163, 1172, 1182. The record seems to support a substantial treatment relationship. The ALJ did not address how, if at all, he factored this information into his determination. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). This factor should be evaluated on remand.

The ALJ also failed to discuss the factors of supportability and consistency. *See* 20 C.F.R. § 404.1527(c)(6) ("When we consider how much weight to give to a medical opinion, we will also consider any factors . . . which tend to support or contradict the medical opinion. For example, . . . the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion."). Although the ALJ summarized the medical record that contained information that supported and was consistent with Dr. McNally's assessment, he did not discuss any of that evidence in his determination to give Dr. McNally's opinion little weight.

Finally, the ALJ did not mention Dr. McNally's specialization. Dr. McNally is an orthopedist. He diagnosed Plaintiff with spinal stenosis of the lumbar region with radiculopathy, cervical spondylosis with radiculopathy, degeneration of intervertebral disc of the mid-cervical region, thoracic spinal stenosis, thoracic spondylosis with cord compression, thoracic degenerative disc disease, lumbrosacral spondylosis with radiculopathy, lumbrosacral disc degeneration, cervicalgia, lumbago with sciatica, and radiculopathy of leg, which are all diagnoses within his specialization. R. 831. An ALJ should generally give more weight to the medical opinion of a

specialist about medical issues related to his or her area of specialty. 20 CFR 404.15327(c)(5). These factors may weigh in favor of giving greater weight to Dr. McNally's opinions and the ALJ's failure to address them was error requiring remand.

*E. Agency physician opinions*

The ALJ's flawed analysis of Dr. McNally's opinion is compounded by his failure to explain why he gave more weight to the opinion of agency physician Dr. Nimmagadda. R. 26. Plaintiff argues that the ALJ erred in relying on the outdated opinion of this agency consultant, given that there was later evidence that his prospective finding was incorrect and because there was subsequent new, significant medical evidence that reasonably could have changed the agency physician's opinion.

The Seventh Circuit has stated: "ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion'." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (quoting *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)). The Seventh Circuit has also found it critically important for an ALJ to submit to medical scrutiny evidence such as MRIs, if it is new and potentially decisive medical evidence. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

Here, the ALJ both relied on an outdated opinion despite significant subsequent medical diagnoses and failed to submit a lumbar MRI to medical scrutiny. Dr. Nimmagadda completed his RFC assessment on September 9, 2016. R. 90-93. At that point, Plaintiff had undergone one surgery during the relevant period and his progress and recovery were being closely monitored. R. 762, 885, 891, 1031. However, Plaintiff underwent another EMG and NCS and a lumbar MRI, not to mention another surgery, that Dr. Nimmagadda was unable to account for due to the timing of

17

the assessment. R. 997, 1000, 1040, 1055. Moreover, the EMG revealed right L5 and bilateral S1 radiculopathy and the MRI revealed multilevel degenerative disc disease with multilevel impingement of the dural sac, most prominent at T12-L1 where there was ventral cord distortion. R. 1048, 1053, 1097. These findings may indeed be significant and may have impacted Dr. Nimmagadda's opinions if he had reviewed them.

Defendant argues that the ALJ did not rely on the opinions of Dr. Nimmagadda but rather chose to give the opinion only "some weight". However, the ALJ does not explain why he chose to give more weight to a non-treating physician who had an incomplete record of the Plaintiff's medical condition than he gave to the opinions of Plaintiff's treating orthopedist. More importantly, with Plaintiff's complicated medical history, the significant number of radiographic tests done, and the multiple surgeries performed (with another one planned), it is unclear how the ALJ could formulate an RFC without some medical input. Given that he accorded "little weight" and only "some weight" to the only medical opinions in this case, the ALJ should have retained an expert to provide guidance here. On remand the Court expects that an expert will be retained to interpret this complicated medical picture. Because this case will be remanded on the above stated issues, the Court finds it unnecessary to address the remaining arguments.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion.

Date: January 27, 2021     By: _Lisa A. [signature]_
Lisa A. Jensen
United States Magistrate Judge